## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 19-23059-CIV-WILLIAMS/TORRES

BERKLEY INSURANCE COMPANY,
a foreign corporation,

      Plaintiff,

v.

SUFFOLK CONSTRUCTION
COMPANY, INC., a foreign corporation,

      Defendant.

_____/

SUFFOLK CONSTRUCTION
COMPANY, INC., a foreign corporation,

      Third-Party Plaintiff,

v.

TITUS CONSTRUCTION GROUP, INC.,
a Florida corporation,

      Third-Party Defendant.

_____/

### ORDER ON MOTION TO EXCLUDE EXPERT TESTIMONY

This matter is before the Court on Plaintiff, Berkley Insurance Company ("Berkley"), and Third-Party Defendant, Titus Construction Group's ("Titus"), Motion to Exclude Expert Testimony [D.E. 91]. The Motion is ripe for disposition. After careful consideration of the motions and the record presented, Berkley and Titus's Motion to Exclude Expert Testimony is **GRANTED** in part and **DENIED** in part.

1

## I.   BACKGROUND

Based on diversity jurisdiction, Berkley commenced this action in this District on January 20, 2020.  The case arose from the construction of a skyscraper in Downtown Miami. Berkley issued surety bonds relating to the construction contracts between Suffolk, the general contractor on the project, and Titus, a subcontractor hired by Suffolk to perform specific work on the project. Berkley's surety bonds guaranteed Titus's payment for its project work.  When Suffolk failed to pay Titus under their construction contracts, Berkley paid Titus. However, believing that Suffolk wrongfully withheld compensation, Berkley subsequently filed suit against Suffolk to recoup its surety bond losses. Additionally, Berkley sued Titus as a third-party defendant.

Suffolk filed its Answer, Affirmative Defenses, and Counterclaim to Plaintiff's Amended Complaint. [D.E. 32].  The defenses raised included prior breach of the Subcontracts by Titus and a Counterclaim against Berkley, as Titus's surety under the Bonds, based on alleged breach by Titus of the Subcontracts. Suffolk also filed a Third-Party Complaint against Titus seeking damages for alleged breach of the Subcontracts. [D.E. 33]. Consequently, Berkley filed its Answer and Affirmative Defenses to Suffolk's Counterclaim [D.E. 45], in which it asserted a defense based in part on Suffolk's own breach of the Subcontract.  Berkley also raised a defense to Suffolk's demands on Berkley's Residential Tower Bond, seeking to recoup expenses it incurred in financing over $4.1 million to Titus to enable Titus to continue performing under the Residential Tower Subcontract. Berkley thus posits that this

sum should be credited against the Bond penal sum that was a focus of the counterclaim, thus limiting Suffolk only to recovery of whatever amount remained in the penal sum after Berkley's financing expenditures were deducted.

## II.   APPLICABLE PRICIPLES AND LAW

### A.   *Daubert Standard*

The decision to admit or exclude expert testimony is within the trial court's discretion, and the court enjoys "considerable leeway" when determining the admissibility of this testimony. *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). The admissibility of expert testimony is governed by Fed. R. Evid. 702, which states: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the district courts also serve as the gatekeeper, tasked with safeguarding the principle that expert testimony is admissible when "sufficiently reliable and relevant to be considered to the jury." *Smith v. United States*, No. 22-13645, 2023 U.S. App. LEXIS 20333, at *11 (11th Cir. Aug. 7, 2023); *United States v. May*, 846 F. App'x 831, 836 (11th Cir. 2021). Additionally, district courts acting as gatekeepers engage in a three-part test to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d 1183, 1194 (11th Cir. 2010); *City of Tuscaloosa v. Harcros Chemicals,* 158 F.3d 548, 562 (11th Cir. 1998). The party offering the expert testimony carries the burden of laying the proper foundation for its admission, and a preponderance of the evidence must show admissibility.

However, the gatekeeping role prescribed by Rule 702 is not intended to supplant the adversary system or the jury's role. Therefore, the district court's duty does not require an ultimate conclusion as to the persuasiveness of the proffered evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking but admissible evidence." *Daubert*, 509 U.S. at 596. The Eleventh Circuit refers to the requirements mentioned above as the "qualification," "reliability," and "helpfulness" prongs, and while they "remain distinct concepts,"; "the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech*, 326 F.3d at 1341).

In determining the reliability of a scientific expert opinion, the Eleventh Circuit also considers the following factors to the extent possible: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected

to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis. *Quiet Tech*, 326 F.3d at 1341 (citations omitted).

Further, expert opinion may also be excluded under Rule 403 of the Federal Rules of Evidence, if its probative value is substantially outweighed by a bander of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403; *Frazier*, 387 F.3d at 1263.

### B.      *Rule 26(a) Required Disclosures*

Federal Rule of Civil Procedure 26 provides that each party must disclose the identity of its expert witnesses, along with a written expert report disclosing, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Expert disclosures must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).

A party has an ongoing duty to supplement these initial disclosures and any responses to requests for production. Fed. R. Civ. P. 26(e)(1)(A). According to Rule 37(c)(1), if a party fails to supplement an initial disclosure or a request for production as required by Rule 26, that "party is not allowed to use that information or witness

to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The purpose of Rule 26 is to prevent the sandbagging of an opposing party with new evidence. *King v. Cessna Aircraft Co.*, 2010 WL 11505695, at *1 (S.D. Fla. May 7, 2010). Expert disclosure requirements under Rule 26(a)(2)(B) are "intended to provide opposing parties reasonable opportunity to prepare for effective cross-examination and perhaps arrange for expert testimony from other witnesses." *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1362 (11th Cir. 2008). The "party who is alleged to have failed to comply with Rule 26 bears the burden to show that its actions were substantially justified or harmless." *Noel v. MHC Heritage Plantation, LLC*, No. 21-14492, 2022 U.S. Dist. LEXIS 125680, at *7 (S.D. Fla. July 15, 2022).

When deciding whether a failure to comply with Rule 26(a) or (e) is substantially justified or harmless, a court must consider the non-disclosing party's explanation, the importance of the information, and any prejudice to the opposing party if the information were admitted at trial. *Romero v. Drummond Co.*, 552 F. 3d 1303, 1321 (11th Cir. 2008). Substantial justification is "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request." *Hewitt v. Liberty Mut. Group, Inc.* 268 F.R.D. 681, 682–83 (M.D. Fla. 2010). Furthermore, an untimely disclosure is harmless when there is no prejudice to the party entitled to receive the disclosure. *Id.*

### III.   ANALYSIS

Plaintiff, Berkley, and Third-Party Defendant, Titus, move to exclude the expert testimony of Suffolk expert David Pogorilich. Berkley and Titus's motion argues that Mr. Pogorilich's report and testimony contain no scientific or technical analysis, consist entirely of bald statements without applying any technical or other specialized knowledge, and rely entirely on improper legal conclusions. Mr. Pogorilich's testimony is admissible if: (1) he is qualified to testify competently regarding the matters he intends to address; (2) he utilized a sufficiently reliable methodology, per *Daubert*, to reach his conclusions; and (3) his testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Alonzo v. Biomet, Inc.*, No. 0:21-cv-62232-WPD, 2023 U.S. Dist. LEXIS 86947, at *2 (S.D. Fla. Apr. 13, 2023). We will discuss each of these elements in turn, divided among what Suffolk has proffered as the opinions he is prepared to offer in the case.  After doing so, and as we detail below, we agree with Berkley and Titus that excluding Mr. Pogorilich's testimony is warranted in this case, but only with respect to one aspect of his testimony.

### A.   *Expert's Qualifications*

To be qualified as an expert, a witness "must have sufficient skill or knowledge related to the pertinent field or calling that his inference will probably aid the trier in the search for truth." *Leblanc v. Coastal Mech. Servs., LLC*, No. 04-80611-CIV, 2005 U.S. Dist. LEXIS 45889, at *4 (S.D. Fla. Sep. 6, 2005). Under Rule 702, an expert may present testimony if he is qualified "by knowledge, skill, experience, training, or

education." Fed. R. Evid. 702. A court should exclude an expert witness's testimony if the witness is not qualified to testify in a particular field or on a given subject. However, Rule 702 does not mandate that an expert be highly qualified to testify about a given issue.

Suffolk concedes that Mr. Pogorilich is not offering opinions founded upon scientific, mathematical, technical, or industry-standard methods. Instead, Mr. Pogorilich is solely making statements based on a generalized concept of experience in the construction industry. Suffolk intends to rely on his testimony, predicated on this construction experience, to show the reasonable measures taken by Suffolk to mitigate the damages resulting from Titus's breach of contract and the extent of control by Berkley over Titus concerning the Project. (Exhibit D at 6–8). Therefore, for Mr. Pogorilich to testify regarding Berkley and Titus's actions, his "experience" must qualify him regarding the matter he intends to address. *Frazer*, 387 F.3d at 1260.

### 1.  *Mr. Pogorilich's Credentials Regarding Titus as a Subcontractor*

Suffolk first proffers that this expert is prepared to testify as to the nature and degree of Titus's performance as a subcontractor on the project.  To determine whether Mr. Pogorilich is qualified to render opinions on this topic, we must examine the credentials of the proposed expert in light of the subject matter of the proposed testimony. *See, e.g., J.G. v. Carnival Corp.*, No. 12-21089-CIV, 2013 U.S. Dist. LEXIS 26891, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013); *Altagracia Banuchi v. City of Homestead*, 606 F. Supp. 3d 1262, 1272 (S.D. Fla. 2022).

Mr. Pogorilich is a Managing Director at Ankura with extensive experience in all aspects of construction, from inspections and estimating to construction management, as well as analysis and resolution of claims on projects in the United States and abroad. [D.E. 91-3]. Mr. Pogorilich's twenty-five years of experience includes:

> Apartment Complex Claims Analysis: Led the repair estimate on a midwest apartment complex. The estimate was required due to major flooding throughout Texas. This estimate was used to negotiate with the developer's insurance company resulting in a mutually agreeable settlement.

> Multi-Family Apartment Complex Analysis: Provided delay claim and standard of care analysis as well as repair damages estimate for a multi-building apartment complex in Tampa, Florida. Testified in deposition resulting in settlement of case.

> Property Developer Defect Claims: Provided expert analysis on the defective construction and repair damages analysis on six Properties (200 units) on a single site near St. Johns River, Jacksonville, Florida.

> Property Developer Damages Analysis: Led a defective construction and repair damages analysis on four properties containing (163 units) in Tampa, Florida.

[D.E. 91-3, pp. 33, 34].

Additionally, Mr. Pogorilich is a certified general contractor in Florida who has provided testimony for a deposition, trial, mediation, arbitration, and development review committee hearings. [D.E. 91-3, pp. 35–37]. Based on these credentials and this experience, Mr. Pogorilich is certainly qualified to provide expert testimony about the nature and quality of the construction of Met Square and, specifically, Titus's role as a subcontractor on the project.  We must later decide whether the

opinion he is prepared to render is sufficiently reliable given the scope of his examination.  But he is undoubtedly qualified to render such an opinion.

### 2.    *Mr. Pogorilich's Credentials Regarding the Surety Bond*

Suffolk also proffers Mr. Pogorilich as an expert who can opine as to how Suffolk handled its role in the project and, specifically, the reasonableness of the measures taken by Suffolk to mitigate its damages resulting from Titus's default under the subcontract.  As part of that testimony, Mr. Pogorilich will also opine that Berkley, as surety, took over the role as subcontractor in place of Titus and is thus liable to Suffolk directly for all damages owed by the subcontractor.  That is, the expert opines that Berkley became the "de-facto subcontractor" by assuming control over Titus and directly attempted to complete the scope of work under the Residential Subcontract, thereby waiving any defense that Berkley's liability to Suffolk is limited to the penal sum of the Residential Bond.

To render these opinions, however, Mr. Pogorilich must have demonstrable qualifications to proffer opinions on Berkley's conduct as a surety.  Although Mr. Pogorilich has experience within the construction industry, he failed to proffer any experience related to the surety industry in any tangible or meaningful way.  He has no degrees or certification in the surety industry (Depo. 16:5). He is unaware of the authoritative published source materials regarding surety bonds and surety bond sites. (Depo. 16:10–14). He did not review any publications, scholarships, or academic materials when preparing his report. (Depo. 16:15–17). Even though Mr. Pogorilich has reviewed industry standards and articles as part of his daily routine, he cannot

attest to whether he has used them specifically for his report. (Depo. 16:34–25, 17:1–2). Additionally, a surety company has never employed Mr. Pogorilich, and he was even unsure if he had specific authority to adjust bond claims on behalf of any surety company. (Depo. 17:14–24).  The absence of any of this type of evidence or experience strongly belies his claim that he is an "expert" to opine on how Berkley handled itself or how it has no limitations of liability as a surety under this bond. *See Everett v. Georgia-Pacific Corp.*, 949 F. Supp. 856, 857 (S.D. Ga. 1996) (finding the witness not qualified as an expert because he practiced in family medicine and surgery with no specialized knowledge or training in the relevant field of toxicology).

To be fair, Mr. Pogorilich has made recommendations to surety companies and has personally made decisions for a surety company about how to handle a bond claim. (Depo. 18:5–7). Because of Mr. Pogorilich's role as a consultant, he has made recommendations to bonding companies as to whether or not to continue to bond a particular client, what the actual percent completion of a project is, and what the financing conditions of the project are. (Depo. 18:19–25).  Perhaps this is sufficient, though minimal, experience to talk about how a surety is engaged in a construction project. *See Castro v. Carnival Corp.*, No. 21-20373-CV-GAYLES/TORRES, 2022 U.S. Dist. LEXIS 140074, at *9 (S.D. Fla. July 11, 2022) ("[A]n expert only needs to be minimally qualified to testify and does not need to have extensive experience in the exact field or subject of their testimony.").

Berkley and Titus argue that Mr. Pogorilich is not qualified because his generalized experience in the construction industry does not relate to the role of

surety bonds. Nevertheless, for now we will give him the benefit of the doubt and find that he need only be minimally qualified to testify and does not need extensive experience in the exact field or subject of their testimony. Mr. Pogorilich has provided recommendations to surety companies and, therefore, may have minimal qualifications to provide testimony about Berkley's role as a surety. *See, e.g., Alonzo v. Biomet,* 2023 U.S. Dist. LEXIS 86947, at *3 ("[t]he qualification standard for expert testimony is 'not stringent,' and 'so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility.' ") (citations omitted).

### B.   *Reliability of Expert's Testimony*

The plain language of Rule 702 requires an expert witness relying solely on experience to "explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (citing Fed. R. Evid. 702 advisory committee's note (2000 amends.)); *see also Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.") (on remand).

The *Daubert* factors still may apply to evaluating the reliability of an expert's testimony based on "experience," explicitly including: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review

and publication . . . and (3) whether the technique is generally accepted in the . . . community." *Daubert*, 509 U.S. at 593-95. The Eleventh Circuit affords a district court substantial discretion to decide how to test the reliability under *Daubert* of the type of experiential evidence presented by expert witnesses like Mr. Pogorilich. *See, e.g., Sumner v. Biomet, Inc.*, 434 F. App'x 834, 842 (11th Cir. 2011) (finding Plaintiffs' expert testimony unreliable under *Daubert* because the expert was unable to identify publications or scientific studies that supported his theories). The trial court's responsibility in determining the reliability of expert witness testimony is limited to considering the witness' methodologies, not the conclusions the expert reached. *See, e.g., Daubert*, 509 U.S. at 594–95; *Olin v. Demings*, No. 6:12-cv-1455-Orl-28-TBS, 2014 U.S. Dist. LEXIS 3892, at *6 (M.D. Fla. Jan. 13, 2014) (granting motion to strike expert testimony because the expert's opinions were not supported by anything except his own testimony about what he did; court could not discern whether his methods are rooted in real science or whether they are substantively sound).

### 1. *Reliability of Mr. Pogorilich's Analysis of Titus' Performance*

Mr. Pogorilich's "Review and Analysis of the Performance of Titus During the Construction Phase" states that "there is evidence that Titus failed to perform its obligation under the Subcontract, including completing its scope of work within the duration specified in the project schedule." [D.E. 91-3, pp. 14–17]. To support his statement, Mr. Pogorilich provides quotations from emails Suffolk sent to Titus asking for additional "manpower." [D.E. 91-3, p. 15]. Beyond the selected quotation, Mr. Pogorilich does not include Titus's response to these emails nor Titus's

statements that its "manpower" was sufficient. Ultimately, there is no analysis of any kind to show whether Titus performed under the parties' contract.

Further, he generically cites to "industry knowledge" to explain Titus's "manpower" on the project schedule but no analysis of Titus's actual "manpower" concerning the scope of work. And he cites no calculation regarding what Suffolk claims to be sufficient work. To sum up, the scope of Mr. Pogorilich's expertise is that "if Suffolk said it in an email, it must be true." Without any relevant analysis regarding Titus's work, the information provided in Mr. Pogorilich's report is apparently unreliable and fails to show how his experience produced the analysis.

Nevertheless, given his qualification as a general contractor in the industry, he could have certainly provided specific examples of deficient work that Titus engaged in or in how it failed to live up to its contractual obligations under the subcontract.  Given that this is a bench trial, the trier of fact will be able to assess his testimony in this regard even though his expert report and deposition did not elucidate any specifics as to what Titus did poorly or negligently.  So, we find that the reliability of his testimony going to Titus's performance can be assessed at trial and is minimally sufficient for purposes of this motion.

### 2.  *Reliability of Mr. Pogorilich's review and analysis of Suffolk's performance during the construction phase.*

The same finding can also be made with respect to Mr. Pogorilich's opinion that purports to offer "expert" analysis of "The Performance of Suffolk During the Construction Phase." [D.E. 91-3, pp. 18–25].  But that is only possible if one gives the expert the greatest possible benefit of the doubt given that this is a bench trial.

14

Contrary to the report's stated purpose, the first four pages of this section does nothing more than a pure repetition of various letters Suffolk wrote to Titus broadly claiming breaches of the Subcontracts. The only difference was that Mr. Pogorilich bolded and italicized selected text within the letters. No industry knowledge was applied, only a blind recitation of Suffolk's statements, with additional emphasis added to certain statements. Without much explanation, Mr. Pogorilich alleged that Titus breached the Subcontracts, and then presented legal arguments as to what alleged remedies Suffolk might have had under the Subcontracts.

Overall, there is not one scientific principle, not one technical standard, not one instance of specialized knowledge cited for support, and nothing except "I believe Suffolk." He concludes that Suffolk acted reasonably to mitigate its damages resulting from the actions or inactions of Titus and met its contractual obligations on the Project. [D.E. 91-3, p. 4]. Without applying any industry standards and providing any detailed explanation regarding why he believes Suffolk acted reasonably to mitigate its damages, the reliability of Mr. Pogorilich's ultimate opinion in this respect is highly suspect. Nevertheless, given his experience in the industry, and even though his review of the relevant documents in the case may have been more abbreviated than what would be required of a credible expert, we find that any specific opinions he renders with respect to Suffolk's performance should be preliminarily admitted for purposes of this motion. At trial, the trier of fact will still have to reconsider the admission of any particular opinion going to Suffolk's decisionmaking, measured against the credibility of his testimony defending the

reliability of his opinion.  In so doing, that analysis at trial will prevent the expert from being merely used as a mere mouthpiece for counsel in the case.  In other words, if he does not support his conclusions with specifics that the court can trace from the project documents in the case, then the trier of fact will still be required to exclude and/or discount the opinions under Rule 702.

On this score, we note in particular the persuasiveness of the Third Circuit's and our Circuit Chief Judge's analysis of Rule 702 in bench trials:

> Rule 702 applies whether the trier of fact is a judge or a jury. By using the term "trier of fact," rather than specifying judge or jury, Rule 702 does not distinguish between proceedings. . . . Of course, district courts do retain "latitude" to decide "how" to apply those requirements in a bench trial. . . . So a district court has leeway about "whether or when special briefing or other proceedings are needed to investigate" the facts relevant to qualification and admissibility of expert testimony. . . . Or it may conditionally admit the expert testimony subject to a later Rule 702 determination. . . . But that "is not discretion to abandon the gatekeeping function" or "perform the function inadequately. Rather, it is discretion to choose among reasonable means of excluding expertise[.]" . . . That is why the failure to conduct any form of "assessment" of an expert and the proposed testimony before admitting the testimony is an abuse of discretion.

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres,* 949 F.3d 825, 832 (3d Cir. 2020) (citations omitted).  *Accord Sovereign Mil. Hospitaller Ord. of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of Knights Hospitallers of Sovereign Ord. of Saint John of Jerusalem, Knights of Malta, Ecumenical Ord.,* 694 F.3d 1200, 1222 (11th Cir.) (Pryor, J., concurring), *majority opinion vacated and superseded on reconsideration,* 702 F.3d 1279 (11th Cir. 2012) ("Rule 702 governs the admissibility of expert testimony regardless of whether the case is tried to a jury or a judge. Several

of our sister circuits have ruled that "*Daubert's* requirements of reliability and relevancy continue to apply in a bench trial." Although "the usual concerns of [Rule 702] – keeping unreliable expert testimony from the jury – are not present in [a bench trial], and our review must take this factor into consideration," . . . the district court must nevertheless "provide more than just conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function") (citations omitted).

Applying that analysis here, the expert at least stands in the same shoes as Suffolk, as a general contractor, plus he has extensive experience in the industry.  His defense of Suffolk's decisionmaking (in both the expert report and deposition) suffers from gross generality.  But the reliability of his expert opinion to particular questions and hypotheticals may become evident.  And certainly, Berkley and Titus will not be surprised by such testimony given the extensive development of the record in the case.  So, we will Deny the motion at this point with respect to his reliability on the issue of Suffolk's conduct and mitigation efforts after encountering Titus's alleged deficient performance.

### 3.    *Reliability of Mr. Pogorilich's review and analysis of Berkley's performance during the construction phase.*

Having bent over backwards to preliminarily admit Mr. Pogorilich's earlier opinions, we are stretched to the breaking point with respect to his purported expert analysis of Berkley's conduct.   He testified that, after reviewing all the contemporaneous Project documents and correspondence, he could opine *for the first time ever* that Berkley became a "de facto subcontractor."  This conclusion followed

from Berkley requesting all payments for Titus, from its agents' presence at onsite meetings on the project, and from its decisions mandating certain manpower and other resources to be applied to the project after Titus breached.  Berkley exercised complete control over Titus to such an extent that Berkley became the "de facto subcontractor." [D.E. 91-3, p. 4].

Remarkably, however, Mr. Pogorlich has never before attempted to develop the theory he advances of a surety becoming a "de facto contractor."  His "customized" expertise was allegedly generated to advocate for the specific legal arguments of counsel but without any objectively verifiable basis, something that *Daubert* clearly intended to prohibit.  For instance, he testified as follows:

> Q. And that's the reason why those court opinions exist, right, because the Courts recognize that when the surety comes in and it begins to take more of an active role in the project, beyond passive financing, it can prejudice the right of the contractor and actually because it damages when it's trying to preserve its own claims for the surety's own benefit, not that of the contractor. Isn't that the logic behind those cases?
> MR. HARRISON: Object to the form.
> THE WITNESS: I'm not sure which cases you're referring to, Ralf. But, again, I think as a -- as a discussion, if the -- if the bonding company extends its role beyond financing then I would -- I would agree with
>
> ***
>
> Q. Why were you asked to evaluate Berkley's alleged control over Titus?
> A. Because Counsel thought that would be something that would be of interest to the case.
> Q. Were you made aware that that is a legal theory that Counsel is trying to develop to avoid the surety's penal sum limitation?
> A. I'm sure we were at some point. I don't recall specifically when.
>
> ***
>
> Q. Have you ever rendered an opinion about a de facto contractor before this case?

> A. Again, there may have been part of an overall project but not specifically just rendering an opinion about de facto subcontractors.
>
> Q. Can you recall the specific circumstance in your career where you rendered an opinion that somebody was a de facto contractor?
>
> A. Not sitting here today, no.

(Depo. 138:12–25, 139:1–2, 34:17–25, 33:2–10).

An expert must show how his experience leads to the conclusion reached and why that experience is a sufficient basis for the opinion. But in this Report, Mr. Pogorilich claims that a surety may become a "de facto contractor" even though he admitted that, in his entire career, there had not been one time where he had experience evaluating a surety as being a "de facto contractor." (Depo. 33:2–15). Furthermore, Mr. Pogorilich states that he has never seen, known, or even heard about a "de facto contractor" before this case. (Depo. 33:2–15).  And as we stated before, he has no experience acting as a surety in any meaningful way.

To admit this opinion under Rule 702 we must find there to be some showing of how his experience led to or reliably supported his conclusions. While Mr. Pogorilich conveyed that he reviews industry standards and articles "every day, it's just a normal course of my . . . daily routine" (Depo. 16:18 to 17:1), he cannot cite a single industry standard or article that he has seen in his entire career that discusses the "de facto contractor" theory. (Depo. 32:7–15). With no experience to point to and no industry recognition of the "de facto contractor" theory, there is no link between his experience and his opinion besides "I think it's just something that is understood in the industry." (Depo. 33:11-14). Mr. Pogorilich failed to show how his experience

may render a reliable opinion before the trier of fact and nothing in our review of this record can save him on this score.

Under *Frazier*, it is not permissible for an expert to give a subjective opinion merely because he is an expert and experienced in the field, which would eliminate the reliability requirement. Nothing in the record shows how Mr. Pogorilich has used the "de facto contractor" theory in any other analysis when evaluating the responsibility of an insurance company to supplement payments under a surety bond. *See* Advisory Committee Comments to Fed. R. Evid. 702, 2000 amendments (a court "may conclude that there is simply too great a gap between the data and the opinion proffered").

Mr. Pogorilich's opinion fails this test, for instance, because he acknowledges that, in Florida, all contractors must be licensed. Mr. Pogorilich acknowledged his awareness of this requirement (Depo. 35:6–9), and that Berkley is an insurer without a contractor's license. (Depo. 35:10–12). Accordingly, a building permit is a legal requirement to perform work on a project. Mr. Pogorilich knows that Berkley did not hold the building permit; only Titus held a license to perform the Subcontract work. (Depo. 36:15–17, 40:8–18).

Further, Suffolk never terminated the Subcontract with Titus (Depo. 89:18–19), Berkley did not enter into any contract with Suffolk to perform the Subcontract, nor did Berkley enter into any contract with Titus to perform the Subcontract. (Depo. 41:7–24). Additionally, Berkley did not enter into any subcontracts or purchase orders with any subcontractor or supplier to perform the Subcontract, nor did Berkley self-

perform any work. (Depo. 42:8–24). Mr. Pogorilich's experience as a general contractor disregards any existing legal requirements or mandates to draw a conclusory opinion about the parties' contractual relationships and places Berkley in the role of de facto "contractor." And when pressed to defend the legal basis for his opinion, Mr. Pogorilich reverted to the truism that he is not a lawyer and not qualified to give a legal opinion.

So, in short, we have an "expert opinion" that effectively clothes Suffolk's legal conclusions that will be presented in the case. The facts supporting that legal conclusion can be, and certainly will be, presented at trial through testimony of fact witnesses with personal knowledge. To bolster that testimony with an expert opinion, Suffolk must present a witness with experience as a surety (which Mr. Pogorilich does not have) or with practical experience of a contractor who has faced that dilemma (which Mr. Pogorilich admits he also does not have). So the Court on this record has zero basis to find, preliminarily or otherwise, that a reliable expert opinion can be forthcoming through this expert. As to this "de facto subcontractor" opinion, he is *not* an expert at all. Hence, his testimony in this regard must be excluded. *See, e.g., Sumner v. Biomet,* 434 F. App'x at 842-43 ("The district court also did not abuse its discretion in considering the fact that [expert's] theory appears to have been arrived at for the purposes of this litigation, weighing it heavily against the admissibility of [the] opinion. . . . He has never tested or published anything regarding his theory. There is no evidence that [expert] developed his theory during research conducted independent of this litigation."); *UGI Sunbury,* 949 F.3d at 835

(reversing denial of motion to exclude expert who testified that his opinion could not be tested or verified because "I put this all in my little mixing bowl and I come up with what I thought was common sense reasonable[.]"); *Olin v. Demings,* 2014 U.S. Dist. LEXIS 3892 at *3 ("[expert's] qualifications do not guaranty the reliability of his opinions in this case. . . . While he has provided a general description of his practice and methods, his report and deposition testimony do not reveal the specific theories, techniques, methodology, or reasoning he employed to arrive at the conclusions expressed in his expert report and deposition.").

Accordingly, Suffolk cannot satisfy even a barebones showing of reliability with respect to this expert opinion. The motion must be Granted in this respect because, at least, the reliability prong has not been met.

### C.   *Helpfulness of Expert's Testimony*

Expert testimony is admissible "if it concerns matters that are beyond the understanding of the average lay person . . . expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63; *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (finding expert testimony not helpful if it "merely tell[s] the jury what result to reach"). "[T]he court must 'ensure that the proposed expert testimony is "relevant to the task at hand," . . . i.e., that it logically advances a material aspect of the proposing party's case.'" *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

A key issue in this case is whether Suffolk or Titus breached the Subcontractor agreements; therefore, Mr. Pogorilich's task was to show how Titus breached. [D.E. 91-3, pp. 5–6, 29].  Although his opinions on this score are very generalized and appear to be based simply on review of emails, we leave open the possibility that his testimony will prove at least partially helpful.  The challenge to his testimony may be better directed at its weight, rather than their admissibility on helpfulness grounds.

But as to his other opinions relating to Berkley's status as a "de facto subcontractor," his conclusory opinions are as unhelpful as they are unreliable.  Mr. Pogorilich's deposition shows that he only provides legal conclusions. [D.E. 91-3, pp. 6–7, 24, 29–30]. Mr. Pogorilich's analysis does not use any industry standards or methodologies to show reliance on his personal interpretations of the legal requirements of Berkley under the Subcontracts or Bonds.  *See Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) ("[t]he 'basic standard of relevance . . . is a liberal one,'. . .[,] if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry[,]' it should be excluded because there is no 'fit.'").  Instead, Mr. Pogorilich provides excerpts from emails between Suffolk and Titus to prove Titus breached under the Subcontracts, which caused Berkley to "take over" those contracts.  Indeed, Mr. Pogorilich offers no expert opinion, knowledge, or method to show how he has any expertise to add to the equation.  Instead, Suffolk is merely using Mr. Pogorilich as a mouthpiece to present legal conclusions to the trier of fact based on Suffolk's interpretation of the contract

documents.  That is not helpful under the Rule.  *See Romano v. John Hancock Life Ins. Co. (USA)*, No. 19-21147-CIV, 2022 U.S. Dist. LEXIS 83703, at *81 (S.D. Fla. May 9, 2022) (finding contract interpretation an impermissible legal conclusion that does not qualify as expert testimony); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) ("testifying experts may not offer legal conclusions."); *Hibbett Patient Care, LLC v. Pharmacists Mut. Ins. Co.*, No. CV 16-0231-WS-C, 2017 U.S. Dist. LEXIS 72786, 2017 WL 2062955, at *2 (S.D. Ala. May 12, 2017) ("After all, '[e]ach courtroom comes equipped with a "legal expert," called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.'").

The record shows that, at bottom, Mr. Pogorilich based his entire de facto contractor analysis on Suffolk, Titus, and Berkley's communications with each other during construction. [D.E. 91-3].  But the trier of fact, the Court, can more expeditiously review the emails between the parties and reach any legal conclusions that can be drawn from them.  The Court is also fully conversant with Florida law regarding contracting and subcontracting.  Therefore, because the Report does nothing more than instruct the Court to agree with Suffolk's predetermined theories without providing industry knowledge or methodologies, Mr. Pogorilich's expert testimony is not helpful for a trier of fact.  Because his unreliable opinion with respect to Berkley's "take over" of the Subcontract is so unhelpful, it is also inadmissible under Rule 702 under this prong of the test.

### IV.    CONCLUSION

For the foregoing reason, it is hereby ORDERED AND ADJUDGED Berkley and Titus's Motion to Exclude Expert Testimony [D.E. 91] is **GRANTED** in part and **DENIED** in part.  The motion is Granted with respect to any opinion offered by the expert as to the actions or non-actions of the surety, Berkley, and specifically whether Berkley became a "de facto" subcontractor under the contract documents or Florida law.  In other respects, the motion is Denied without prejudice to specific challenges made during trial to the admissibility or reliability of other opinions presented through this expert.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 23rd day of October, 2023.

EDWIN G. TORRES
United States Magistrate Judge